# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

ORTHOPHOENIX, LLC,                :
                                  : C.A. No. 13-cv-1628-LPS
        Plaintiff,                :  █████████████
    v.                            :
                                  :
STRYKER CORPORATION,              :
et al.,                           :
                                  :
        Defendants.               :


            Monday, September 26, 2016
            9:00 a.m.


            Oral Argument
            Courtroom of Chief Judge Leonard P. Stark

            844 King Street
            Wilmington, Delaware


    BEFORE:   THE HONORABLE Chief Leonard P. Stark,
              United States District Court Judge


    APPEARANCES:


            SHAW KELLER LLP
            BY:  JOHN SHAW, ESQ.

                        -and-

            WEIL, GOTSHAL & MANGES LLP
            BY:  EDWARD REINES, ESQ.

                On behalf of Medtronic

```
 1        APPEARANCES CONTINUED:

 2

 3               BAYARD, P.A.
                 BY:  STEPHEN BRAUERMAN, ESQ.

 4                          -and-

 5               RUSS, AUGUST & KABAT
                 BY:  JACOB BUZCKO, ESQ.
 6
                     On behalf of Orthophoenix LLC
 7

 8

 9               YOUNG CONAWAY STARGATT & TAYLOR, LLP
                 BY:  ANNE GAZA, ESQ.

10                   On behalf of Stryker Corporation

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

```
1                    THE COURT:  Good morning.  Can

2      your put your appearances on the record for us,

3      please?

4                    MR. BRAUERMAN:  Good morning, Your

5      Honor.  Steve Brauerman from Bayard on behalf of

6      Plaintiff Orthophoenix LLC.  I'm joined at

7      counsel table by Jacob Buczko from Russ, August

8      & Kabat in Los Angeles.  With Your Honor's

9      permission, Mr. Buczko will address the Court on

10     this presentation.

11                    THE COURT:  That's fine.  Thank

12     you.

13                    MR. SHAW:  Good morning, Your

14     Honor.

15                    THE COURT:  Good morning.

16                    MR. SHAW:  John Shaw for

17     Medtronic.  I'm joined with Edward Reines from

18     Weil Gotshal and Andy Horstman from Medtronic.

19                    MR. REINES:  Good morning, Your

20     Honor.

21                    THE COURT:  Good morning.

22                    MR. GAZA:  Good morning, Your

23     Honor.  Anne Gaza from Young Conaway on behalf

24     of Stryker Corporation.  Your Honor, Stryker
```

1 does not have a part in this motion.  However,

2 we are present today.  To the extent that the

3 proceedings address the underlying agreements

4 between the parties, we would request that the

5 proceedings be sealed to give the parties an

6 opportunity to review the transcript and redact

7 out anything regarding the underlying agreement.

8     My understanding is the parties

9 don't object to that and there are no nonparty

10 individuals here that would be asked to step

11 out.

12     THE COURT:  Mr. Reines; is that

13 correct?

14     MR. REINES:  Yes.  We don't think

15 it's much in here that would be a problem for

16 being careful.  That's fine.

17     THE COURT:  Mr. Buczko?

18     MR. BUCZKO:  Yes, that's fine.

19     THE COURT:  All right.  Well, we

20 will treat this proceeding as confidential for

21 the moment but I do want the parties in a very

22 timely manner to review the transcript and

23 propose redactions to it.  Okay?

24     MS. GAZA:  Thank you, Your Honor.

1    We will do so.

2              THE COURT:  We're here on

3    Medtronic's motion.  We will hear from

4    Medtronic.

5              MR. REINES:  Thank you, Your

6    Honor.  I thought the most useful thing to start

7    with would be the history and frankly the facts

8    because they speak for themselves ultimately.

9    The story starts with April 2013 Medtronic sold

10   patents to what everybody called OP which are

11   the Orthophoenix Parties.

12              As part of that, Medtronic

13   received ██████████████████████████████████

     ████████████████████████████████████████  Two

     other provisions are associated with this

16   transaction that are background relevant and

17   those are the indemnity provisions.  We don't

18   need to go through them in detail at this point,

19   but basically the sale document had an indemnity

20   provision from the Orthophoenix Parties,

21   Medtronic and the license back had an indemnity

22   agreement.  A suit was filed in this case in

23   October 2013.

24              In winter of 2016, so this past

1    winter, the parties had ████████████████

██   ████████████████████ because essentially the

3    Orthophoenix Parties ████████████████████

██   ████████████████████ was not included

5    whatsoever.  I don't know what they were

6    thinking, but they then came to us and said,

7    well, we want you to agree to all of this.  And

8    we said, no one has talked to us, we didn't have

9    anything to do with it, and the discussions

10   stopped.  They re-emerged in spring and ████████

██   █████████████████████████████████████ because

12   we're not going to get a deal done without them.

13                THE COURT:  Is it your view under

14   that original Purchase Agreement whereby the

15   patents went to the Orthophoenix Parties that

16   Medtronic had a say in whether litigation to

17   enforce those patents could be settled?

18                MR. REINES:  Well, this goes to

19   the motion that is still pending but now moved

20   before the Court --

21                THE COURT:  Right, never resolved

22   because you all settled.

23                MR. REINES:  The exact precise --

24   the short answer is no.  But the exact precise

1    details of that motion isn't something I'm

2    fluent in right now.  But we believe that there

3    was standing.  That was our position.

4              THE COURT:  But you're just saying

5    as a practical matter at least your position is

6    that the first set of discussions did not █████

█    ████████████████████████████████████████████

█    ██████████████████████████████████████████████

█    ████████████████████

10             MR. REINES:  It was an oversight

11    and everyone was like, wait, we can't do this

12    because we need Medtronic on board and that's

13    what, in fact, happened.  Basically, █████

█    ████████████████████████████████████████████

█    ██████████████████████████████ because

16    Stryker was taking the position that Medtronic

17    was still the owner of the patents so they felt

18    they couldn't settle and allow that transaction

19    to go forward since they were on record as

20    saying they believe Medtronic was the owner and

21    not OP.

22             And OP needed Medtronic because,

23    A, they needed to satisfy what Stryker wanted █

█    █████████████████████ and, B, because they needed some

1    rights to be perfected to them so they can give

2    Stryker everything Stryker wanted, so that's how

3    it went down.  And then what happened relevant

4    to this story was the draft included essentially

5    the provision that ultimately was in a document,

6    but there was no statement as to when the OP

7    parties would pay Medtronic back and that was a

8    hard problem because we were still recurring

9    fees as part of the settlement agreements, so we

10   were like, how are we going to do this and when

11   you are going to pay.

12              So we said we do not include a

13   payment date for you.  We don't need to put it

14   in the main agreement.  We can agree to that

15   because we were at that point essentially a

16   joint defense or joint offense collegial

17   relationship with them and we suggested 30 days.

18   We noted there's been a bunch of discovery in

19   the last several weeks and we're going to have

20   more statements for you.

21              And then at the end we said, look,

22   we're good, we're just working with you

23   cooperatively so long as there's an agreement

24   that you're going to pay our fees fully and that

1    was unambiguous.  As we got closer to the actual

2    settlement date, we never really got a response

3    back.  And then I wrote Rick Sanchez who was the

4    IP attorney for inhouse for Marathon.

5              And I said, we need to get that

6    date just so we have an understanding.  And I

7    asked him what he proposed, and then we got a

8    response from Doug Croxall and everybody was

9    involved.  Ten days after ██████████████ I

10   would like a full detail of all invoices, so

11   we're going to pay you back but we would like a

12   detail of all invoices.  And Rick Sanchez also

13   responded, 10 days after ████████████ and

14   we want invoices, does this work.

15             So what we then did two days

16   later -- the effective date of the agreement was

17   May 4th.  We sent them the bills we had.  We

18   didn't have all of them.  We didn't have the

19   Special Master.  We noted the Special Master

20   takes some time getting these bills done in the

21   past.  And here the OP parties asked

22   Mr. Horstman, can you send us any additional

23   invoices, we want all of the invoices so we can

24   pay you, clearly understanding that they would

1       have to pay.  We were trying to get all of the

2       invoices from Medtronic and make sure we have

3       all of them.  This is all on May 4th just as the

4       parties are signing the agreement.

5                     I was on a plane at the time

6       actually and said, look, Mr. Horstman may have

7       better information, but we're trying to get you

8       all of them but I think you have everything

9       except for a small amount of May time and some

10      Special Master notes.  Mr. Horstman responded

11      the next day, all of the invoices that have been

12      submitted before, the number at that point was

13      sent within 10 days of the settlement, about

14      $450,000.

15                    The effective date of the

16      Settlement Agreement was May 4th.  All the OP

17      parties signed it.  Here is Provision 2.7.

18      Sorry, the highlighting doesn't do justice

19      there.  But basically if the Court knows

20      anything about this matter, it's all fees and

21      expenses incurred.  It's hard to be clearer than

22      this.  And it specifically notes the Medtronic

23      party will not pay their own fees, costs and

24      expenses.  So you don't need to be an English

1    major to understand this.

2                    Now, this is relatively important.

3    This is Rick Sanchez from OP which says, we need

4    your second amendment which was an amendment

5    to the original Settlement Agreement ███████

███    ███████████████████████████████████

███    ██████████████ we need that because we're going to

8    release our signature pages, because even though

9    it was May 5th, the effective date was May 4th.

10   So we did that deal on May 9th and it says, On

11   May 9th the parties exchanged signature pages.

12   All signatures have been received.  Please

13   release the signature pages.  Mr. Sanchez is

14   kind of running the show, the attorney for the

15   OP parties.

16                   So the key provisions in the

17   Settlement Agreement, we're sort of done with

18   that part of the story, █████████████████

███   █████████  ████████████████████

███   ████████  The litigation was dismissed.

21   ████████████████████████████

███   ████████  Medtronic represented that this was

23   something we were a little reluctant to do but

24   ultimately got talked into because we

1    represented we believed that OP owned the

2    patents.  Normally, you just say we don't own

3    them but, you know, but we went affirmative

4    further and put a representation to that effect,

5    and then the provision that all folks done here

6    today, that they would pay all fees and

7    expenses.

8              So we wanted to understand when

9    the clock would run because we were obviously

10   not going to be party to ███████████████

█    ██████████████████████████ So we

12   said, when did ██████████████ so we know

13   when the 10 days occurred.  ████████████████

█    ████████████████████████ which

15   becomes important because May 21 becomes a

16   significant date.

17             As though we were still going to

18   pay, the party says, Do we have all of the

19   invoices, you indicated there might be more

20   bills, and it's just the remaining bills are the

21   crumbs we just don't have right now, we will get

22   it to you, please confirm the payment, you will

23   wire it.  And then we give them the exact amount

24   which was $563,000; when do you plan to wire

 1          that, May 11th, two days after they had it.

 2                    Now, this is critical.  It says,

 3          Within 10 days as discussed and already agreed

 4          to, so it says, When will you send the $563,000,

 5          when do you plan to wire that referring to the

 6          $563,000, within 10 days it was discussed and

 7          already agreed to.  They had all of the

 8          invoices.  They hadn't asked any questions about

 9          them and they said that they -- I took the

10          already agreed to meaning stop asking us.  We

11          already committed to it.

12                    The 10-day clock expired and we

13          said, when are you going to pay because we

14          wanted to be diligent.  I didn't think any of

15          this was going to happen when I was involved in

16          this, no idea.  We said that's when we thought

17          the payment would be.  And then he said, We need

18          the wire account and he said that he was going

19          to wire the payment to the account identified in

20          the original and sale document so when we

21          originally sold them the patents in 2013, it had

22          the wire information.  He said he was going to

23          use that.

24                    Then we got a letter hours later

```
 1      which must have been already written where they

 2      rejected it and said talk to Mr. Spangenberg

 3      who's the principal of OP.  My guess for the

 4      benefit of the Court is that all of these people

 5      agreed to all of this unmistakably and

 6      Mr. Spangenberg got wind of it and said, we're

 7      not paying, have them talk to me and then

 8      attempted negotiating down.

 9                  THE COURT:  Well, is there a

10      scenario under which who should try to confirm

11      your guess?  My understanding is a motion like

12      this is sort of like summary judgment.  I think

13      there is a general disputed material fact and

14      deny the motion.  Maybe we go into discovery and

15      ultimately trial.  Is that one way that we might

16      need to consider resolving this dispute?

17                  MR. REINES:  I think that any

18      summary judgment standard is met.  You probably

19      are not surprised but it seems point blank.  If

20      there was a question, I don't know if we can try

21      the issue as lack of consideration, mistake.  If

22      the Court thinks there's triable issues of fact

23      on that, I guess we can have an evidentiary

24      hearing, maybe not a trial but an evidentiary
```

1     hearing, an enforcement.  And --

2                    THE COURT:  Well, let's start

3     breaking it down.  Your position is that the

4     Settlement Agreement Provision 2.7 could not be

5     clearer.  That's as far as I need to go, just

6     construe that, right?

7                    MR. REINES:  Yes.

8                    THE COURT:  So what is the word or

9     phrase "by contract" doing in there?  You said

10    it wouldn't be clearer.  Would it be clearer if

11    you didn't have the phrase by contract in there?

12                   MR. REINES:  I don't know why that

13    particularly was in there.

14                   THE COURT:  Why doesn't it mean

15    pursuant to the Purchase Agreement which has a

16    much more limited indemnification?

17                   MR. REINES:  By contract could

18    mean something along the lines -- I think by

19    contract means we're agreeing to that.  But

20    let's just take that interpretation.  There was

21    a debate about the indemnification and this was

22    resolution of it signed by everybody that said

23    all even.  If it was that, it's a resolution of

24    that debate.  In other words, we are going to

1    agree for purposes to get the Settlement

2    Agreement so they can get ████████████

█    ████████ that your indemnity by contract is for

4    the entire amount.  Does that make sense?

5              THE COURT:  Well, I guess I'm

6    still concerned with for sake of argument if I

7    don't agree with your interpretation of 2.7 that

8    it's clear and unambiguous and supersedes the

9    more limited indemnification obligation they

10   undertook in the Purchase Agreement, where does

11   that leave me?

12             MR. REINES:  I have this in the

13   presentation of -- so there's four arguments

14   that they make so it depends on which one the

15   Court decides to have a triable issue.  If it's

16   a mistake, then I think we need summary

17   judgment.  I'm going to argue the merits of the

18   motion which is they didn't put in any

19   declarations from anyone that there is any

20   mistake.

21             In terms of interpretation, to the

22   extent the Court finds ambiguity by contract, in

23   other words, we're talking about the old

24   indemnity agreements, the fact that parties

1    agreed and negotiated that those would be

2    understood to include all fees would resolve

3    that.

4                    THE COURT:  Am I correct that your

5    position is that the Purchase Agreement and

6    License Agreement indemnification obligation do

7    not extend as far as the Settlement Agreement

8    obligation does?

9                    MR. REINES:  No, I think they do.

10                   THE COURT:  Well, why don't you go

11   to that.

12                   MR. REINES:  Okay.

13                   THE COURT:  Your view is if you

14   didn't have 2.7 by contract all and we won't pay

15   anything of our own, you would still have the

16   same position, namely, that the roughly $600,000

17   or so is owed to you anyway?

18                   MR. REINES:  Right, but I think

19   there was a compromise of that position which

20   agreed that they would pay us in full, so I

21   think that's looking for something to tackle and

22   I'm happy to do it.  So there are four arguments

23   that is the next slide.  Lack of consideration

24   that there was no indemnification, essentially

1    saying that the old agreements apply which is

2    the one it seems the Court has some interest in.

3    Mistake and then expenses aren't reasonable, the

4    last one is not really a reason to deny

5    responsibility.

6              I don't know if you want a lack of

7    consideration argument, but that's what their

8    argument is, cannot identify consideration,

9    cannot identify consideration.  Do you want

10   me -- the consideration was a mutual release.

11   There was more consideration based on the fact

12   that we represented that the OP parties had the

13   right to do it which is a representation that we

14   made.

15             By the way, this is the -- I just

16   want to get to this.  In the Court's dismissal,

17   the Court recited this agreement.  Now, that's

18   got two relevancies.  One is that it establishes

19   a jurisdiction for this motion.  The other side

20   hasn't seriously contested that.  Obviously,

21   they have a duty to bring it to the court --

22   obligations as early as possible.  But in any

23   event, the provision is stated right there,

24   acknowledged a contractual obligation to

1      indemnify Medtronic for its costs.

2              Now, the arguments about -- I

3      guess the Court is saying we're reaching back

4      and not abiding by this.  At least for the

5      purpose of consideration, lack of consideration,

6      I don't think those arguments are viable for a

7      court order.  In other words, the Court has this

8      order, you would have to vacate the order on the

9      theory on the form of unenforceability.  That

10     has not happened.

11              THE COURT:  What is being referred

12     to when it says the contractual obligation is

13     acknowledged?

14              MR. REINES:  All I think the by

15     contract and contractual obligation is that this

16     isn't a 285 style fee-shifting stemming from

17     allegations of misconduct or allegations of

18     court behavior.  This is just an agreement

19     between the party.  A contract means an

20     agreement from one party to the other.

21              I think investing -- especially

22     with the extrinsic evidence, they agreed to all

23     the money being paid, the use of all, the intent

24     of the parties beforehand, the fact that it's

1          recited in the Court's dismissal order which was

2          viewed by litigation counsel.  All of these

3          things point in the direction that by contract

4          means that it's an agreement between the parties

5          of contractual character, not an acceptance that

6          someone may have had a bad faith argument or

7          that there's ascensions or any of those other

8          things that I would consider to be -- they're

9          not necessarily tortious, but you might consider

10         them equitable or by statutory.

11                    THE COURT:  Might Medtronic have

12         had a 284 claim against Stryker?  Would that be

13         a part of the consideration that you would see

14         in the Settlement Agreement?

15                    MR. REINES:  Now, that you

16         mentioned that I don't know about 284 because

17         the claim they brought against us is antitrust.

18         We always thought that was a meritless claim.

19         So we waived all of  our -- we contributed any

20         claim we had.  So here what is acknowledged

21         contractual obligation, I don't see how that

22         means we ignore the plain language, the intent

23         to the parties and the surrounding extrinsic

24         evidence and reach back to the indemnity

1      agreements, but I do want to get to those.

2                    Here is the law about the lack of

3      consideration.  And this is actually worth a

4      second on the consideration point.  This says

5      even if the consideration exchanged is grossly

6      unequal or of dubious value, the parties are

7      free to make their bargain.  Even if you think

8      the indemnity provisions we had from the

9      original Purchase Agreement or License Agreement

10     were weak, let's just say that's what the Court

11     concluded, the parties are entitled to negotiate

12     part of this Settlement Agreement when they're

13     trying to get ████████████████ needing us

14     to do that.  We're going to all agree that that

15     should be all.

16                    You don't go back and look how

17     strong the position is when the parties have

18     compromised on something.  That's what this

19     consideration is and that's essentially what

20     they're trying to do.  They're saying, well,

21     that would have been a bad deal for us.  Those

22     indemnity agreements were weak, why would we

23     ever agree to pay all.  And the answer is

24     because they made a compromise and you don't

 1    relitigate that through the courts.  And here is

 2    case after case that we have for you on that

 3    point.  Even though we wouldn't have been found

 4    to prevail, it's still enough consideration so

 5    it just doesn't work.

 6              So let me -- I'm not going to go

 7    through it because the consideration argument

 8    doesn't seem to be the focus, but the

 9    title-clearing representations were important.

10    Let's talk about the indemnity provision.  In

11    the indemnity provision, they were obligated to

12    ██████████████████████████████

      ████████████████████████████████

      ████████████████████████████████████

      ████████████████████    We were brought into the case as a

16    third-party Defendant, antitrust.  The Court may

17    remember that notwithstanding your very busy

18    docket because of that and, therefore, the costs

19    that we incurred was as a result of that.

20              Now, the Special Master -- and the

21    report is in the court files but we didn't

22    belabor it, but the Special Master made the

23    point to me many times that we were to be

24    treated fully as a party.  I made the argument

```
 1    multiple times that there should be more

 2    balancing of the burdens in discovery because we

 3    had a heavy discovery load because of prior

 4    ownership of the patents in the prior

 5    litigation, and we would argue we're not parties

 6    to the proceeding because of the stay of the

 7    antitrust claim.  And he said, don't make that

 8    argument to me anymore, you're a party.  That's

 9    a graphic example of how the fact that we became

10    a part of all of those costs that are associated

11    to that.

12              THE COURT:  What if I hadn't

13    allowed the antitrust counterclaim in the case,

14    you still could have been on the hook for

15    discovery.  Would it be your view that all of

16    this would still be reimbursable under the

17    original Purchase Agreement?

18              MR. REINES:  Here Section (ii)

19    ████████████████████████████████████████████

      ██  ████████████████████████████████████████

      ██  ██████████████████████████  would have been an

22    indemnification to that, so that would have been

23    a different avenue.

24              THE COURT:  So that's not limited
```

1          by the directly from or in connection with a

2          third party claim against --

3                    MR. REINES:  Right, it's an or

4          before the (ii) and there's another

5          disjunctive between (a) and (b).

6                    THE COURT:  So in your view the

7          (ii) is a separate stand-alone reason and you

8          wouldn't have needed the antitrust counterclaim?

9                    MR. REINES:  Yes.  I mean, maybe

10         my philosophy behind our motion is worth

11         second-guessing but I would just look at their

12         agreement to pay all of our fees and take these

13         contractual arrangements and compromise them for

14         purposes of getting the deal done.

15                   THE COURT:  I guess that's where I

16         started with these questions.  It may or may not

17         be relevant what the Orthophoenix Parties would

18         have been obligated to pay you in the absence of

19         the Provision 2.7 in Settlement Agreement.  It

20         may or may not be relevant.  But if it is

21         relevant, I want to understand your view as to

22         whether it would make a difference.  I think

23         your view is it makes no difference.  They owe

24         us every dollar and penny that we're seeking

1          even under the original Purchase Agreement?

2                         MR. REINES:  Right, and they

3     agreed to that too.  We said the amount is

4     $560,000 which is a little bit less than now

5     because of the various motions and they said,

6     yes, we will pay you that in 10 days.  So it's

7     not just me saying it.  It's the principal of

8     the OP said that after the deal was done.

9                         THE COURT:  Well, after the

10    Settlement Agreement had been executed.

11                        MR. REINES:  Exactly.

12                        THE COURT:  But that's different

13    than whether they agreed to it under the

14    Purchase Agreement.

15                        MR. REINES:  Oh, yes.  No, they

16    didn't originally agree to that.  I don't want

17    any ambiguity about what our position is on

18    that.  They originally denied indemnity.  But

19    again, trying to be clear about this and maybe I

20    should have briefed it more, so I'm having some

21    regrets here, but under Section 3.5 of the

22    License Agreement I don't know how you get

23    clearer than that, ███████████████████████

█     ███████████████████████████████████████

1   ████████████████████████████

    ████████████████████████████

    ██████████████   So, yes, I think the entire

4   amount of money would be due under this.

5                    I don't think it's relevant

6   because the parties negotiated contractually

7   what the obligation would be under 2.7 of the

8   Settlement Agreement and then ratified it

9   afterwards by saying they would pay us the

10  $560,000 and then reneged.  This goes through

11  the different arguments, the antitrust claim

12  which relates to the defense, enforcement or

13  licensing.  We were obligated to provide

14  testimonial, documentary evidence.  Now, that's

15  the consideration argument.

16                    Keep in mind the way it's cast is

17  they're not saying -- I don't know what they're

18  saying.  But in terms of the consideration

19  argument, I think they're saying we didn't have

20  enough right to the indemnity argument that even

21  if they agreed to pay all, it wouldn't be valid

22  because we didn't give them enough because the

23  indemnity obligation was weak.

24                    Their argument -- and this is

1      where I guess I'm seeing it a little different

2      from Your Honor, and I say that with the

3      greatest respect.  Their argument isn't that you

4      can construe 2.7 to be limited by all of these

5      prior agreements in any meaningful way.  Their

6      argument was lack of consideration, and I went

7      through that in the slide deck.  Theirs is your

8      indemnity position was so weak that even if we

9      agreed to pay all, the law doesn't allow that

10     because you haven't given us anything.  And

11     that's just all wrong at so many levels, one

12     reason through the strength of the indemnity

13     provisions.

14             They argued both -- again, it's

15     fuzzy, mutual mistake and unilateral mistake.

16     They want reformation from the Court.  Again,

17     acknowledging that the agreement says what it

18     says.  There's not a contractual interpretation

19     debate regarding 2.7.  Maybe that's where I

20     might have gotten off on the wrong foot with

21     Your Honor.  The argument is lack of

22     consideration and now it's mistake.

23             The Lemelson case is a good

24     example.  Defense counsel played a significant

1     role in drafting the document, contributing to

2     proper understanding.  Mr. Sanchez who's got an

3     impressive resume, which we can go through here,

4     was fully involved, and here is his resume.

5     Croxall and Spangenberg are sophisticated

6     parties too.  No one submitted declarations

7     stating they were mistaken.  You would think

8     that would be a minimal requirement.  Someone

9     says, oh, I didn't realize it said all and then

10    we wouldn't pay it.

11              And then the fact that afterwards

12    they stated when they would pay.  Both before

13    and after they stated when they would pay shows

14    a total lack of mistake.  It completely devoids

15    the merit of that argument.  This is the last

16    point, Your Honor, and then I welcome any

17    questions.

18              On the invoices we sent them to

19    them time and again.  First of all, we sent them

20    through the case, so some of them they had for a

21    year.  We sent them all of them.  Let us know if

22    you have questions.  We gave some explanation

23    and discovery cut-off, close, all those kinds of

24    things.  We largely prevailed on the Special

```
 1          Master but we're still being charged.  We never
 2          heard anything from them until the letter that
 3          came after he was going to send me the wire.
 4                    In that letter they point -- they
 5          say, yes, we have some questions on the
 6          invoices.  It was in the letter that came after
 7          they rejected it, not at the point that we
 8          liquidated the amount and they agreed to it.
 9          And here are the numbers.  They had the invoices
10          at the time of the agreement.  So the idea that
11          this Pandora's box of saying that all fees is
12          such a problematic thing because who knows what
13          Medtronic or Weil or Shaw Keller was going to
14          run up, that we weren't responsible
15          professionals, because I can understand that
16          concern a little bit.
17                    But the problem with that is we
18          gave them essentially all the invoices $563,000,
19          before they did the deal, before they validated
20          it.  They had a full opportunity to look at them
21          and they didn't say you're charging too much,
22          Mr. Reines.  They didn't say your billing rates
23          are too high.  They didn't say raise any of
24          those questions.  So there's really not a
```

1    reasonableness and the reasonableness is

2    integrated into the Settlement Agreement.

3                    And after that, it was close to

4    $10,000 for the Special Master and some mop-up

5    for May, and those followed the same billing

6    practices that we followed through the life of

7    the case.  So through the life of the case, we

8    had billing rates and levels of detail and

9    efficiencies and we followed those same

10   practices through to the end so it's completely

11   safeguarded.  Now, except for maybe the cost of

12   this hearing, it's not like there's a lot more

13   fees.  They're going to be in the same amount --

14   it would be easy.  It's consistent what they

15   approved of which was the $563,000.

16                    THE COURT:  So your view is for

17   the $563,000 I don't even have to think about

18   whether they're reasonable or not because as

19   part of the compromise leading to the Settlement

20   Agreement they agreed to pay all of it?

21                    MR. REINES:  Not only that, when I

22   showed it on the slide, I sent them the amount

23   and they said, yes, we will pay that in 10 days,

24   stop bugging us.

1          THE COURT:  But I suppose you're

2     acknowledging that for the last $100,000 plus,

3     whatever you've run up since August 2016, I do

4     have to assess whether they're reasonable and

5     your view of course is they are reasonable and

6     they're consistent with what you did before, but

7     I need to think through whether I think they're

8     reasonable?

9          MR. REINES:  No, Your Honor.  I

10    think the legal analysis would be whether we're

11    violating the good faith and fair dealing that's

12    inherent in the court order and the Settlement

13    Agreement, because the Agreement says all fees

14    and expenses.  It doesn't say reasonable.  If

15    they hadn't --

16          THE COURT:  That would extend

17    forward.

18          MR. REINES:  If they didn't

19    renege, it wouldn't be an issue.  I explained to

20    them we have this Special Master's bill.  This

21    circumstance where we have this all where it's

22    reasonable as it relates to fees associated with

23    this enforcement is a product of their own

24    conduct.  In other words, it wasn't going to be

1     a problem because they had everything

2     essentially and we described to them what it

3     was.

4                    So to the extent you view them as

5     an anomaly that would be all fees associated

6     with this Motion to Enforce, that's a product

7     of -- we weren't contemplating the Motion to

8     Enforce.  I don't know what they were

9     contemplating on that point.  So it's a product

10    of theirs so I'm not very sympathetic to them on

11    that point, A.  B, I think we have to act in

12    good faith.

13                   I don't think there's any

14    showing -- I don't think they purport to make a

15    showing that we haven't acted in good faith.

16    Their argument is reasonableness based on

17    something and something that I don't think

18    applies.  We have been reasonable.  If the Court

19    wants to take a look, then that's what it is.

20    And I don't think the reasonableness test is the

21    right test.

22                   I think it's a covenant of good

23    faith on how we apply to all and whether we

24    engaged in misconduct associated with that which

```
 1     is the first -- you can imagine the carefulness

 2     we had when we knew this was going to be a

 3     disputed issue before this court with this level

 4     of focus.  I'm sure it was more conservative

 5     after than before.

 6                    On the reneging factor would

 7     also -- I think goes into the interest payment.

 8     They agreed, we did the deal and now we're

 9     having to incur all of these fees and this

10     hassle, things like Mr. Horstman's travel and

11     time, reviewing all of this stuff which we're

12     not seeking reimbursement for because they're

13     just saying they don't owe money that they

14     flatly agreed to.

15                    THE COURT:  Under the Purchase

16     Agreement, I think it's Section 4.14 appears to

17     require you to ██████████████████████

       ████████████████████████████████████████

       ██████████████████████████  Is that a correct

20     interpretation and does the record show asking

21     for representation?

22                    MR. REINES:  Very good question.

23     The attorneys that were suggested for us --

24     there was a discussion, and we saw the indemnity
```

```
 1        at the outset.  And the attorneys that were

 2        offered was OP's party attorneys who at that

 3        time were suing Medtronic so Medtronic wasn't

 4        open to having a law firm that had been adverse

 5        to them and was adverse to them or is going to

 6        be adverse to them, represent them.  Frankly, it

 7        may sound garden variety or whatever to other

 8        people, maybe the OP parties, but to Medtronic

 9        an antitrust claim based on their leadership in

10        the industry is a complex subject and Weil

11        Gotshal has substantial expertise in the IP and

12        antitrust interface and we have been used

13        previously and --

14                    THE COURT:  I don't doubt what

15        you're saying.  Do I have a record of it if I

16        need to reach that issue --

17                    MR. REINES:  Yes -- well, we can

18        provide you --

19                    THE COURT:  That is, that you

20        asked for representation and --

21                    MR. REINES:  Yes.

22                    THE COURT:  -- asked for

23        indemnification?

24                    MR. REINES:  Yes, I think that's
```

1      in writing.  I'm 80 or 90 percent sure that's in

2      writing and the fact of the adversity of the

3      lawyers that were offered is a record obviously

4      because it's a docket.  Whether they responded

5      orally or in writing on that is just not

6      something I'm certain of right here.

7                      THE COURT:  Talk about your

8      position on interest and then we will save your

9      time for rebuttal.  Prejudgment and

10     post-judgment interest is what you think you're

11     entitled to?

12                     MR. REINES:  It's prejudgment

13     until this Court monetizes what the fee award

14     is.  That's under Special Devices, the Federal

15     Circuit case which is kind of a nice case which

16     says we will make a bright line and the Federal

17     Circuit likes to do that sometimes.  It will be

18     quite helpful, saying until fee awards are

19     monetized and quantified, it's not a final

20     judgment just for appeal purposes.

21                     So it's prejudgment interest

22     before.  To the extent the Court says tomorrow

23     you owe whatever the total was that I had up

24     there plus the prejudgment interest for our

```
 1        letter and if they don't pay it for six months

 2        or whatever, that would be post-judgment.  The

 3        post-judgment numbers are minute but --

 4                    THE COURT:  Your view with that is

 5        for purposes of interest what I would be doing

 6        if I grant the motion is entering a judgment

 7        even though there's been a judgment in the

 8        underlying case already?

 9                    MR. REINES:  That's the way the

10        law works with fee awards as being separate from

11        the underlying judgment.  It's an anomaly.

12        People call them final decisions because it's

13        more comfortable to people so that's what you

14        see, people call them final decisions instead.

15                    THE COURT:  Okay.  You've answered

16        my questions for now.  You can reserve the last

17        remaining minutes for rebuttal and let me hear

18        from Mr. Buczko.

19                    MR. REINES:  Thank you.

20                    THE COURT:  Good morning.

21                    MR. BUCZKO:  Good morning, Your

22        Honor.  So Medtronic and the OP parties, so we

23        don't disagree that Orthophoenix should fully

24        comply with any indemnification obligation but
```

1        the parties dispute what the scope of that

2        obligation is.  The primary point that Medtronic

3        makes is that there's an indemnity obligation

4        that was confirmed by the courts.

5                    Your Honor, this is a stipulation

6        of dismissal which was so ordered by Your Honor

7        on May 12th, and we'll see here that, first of

8        all, this stipulation of dismissal only states

9        that the Court shall retain jurisdiction to

10       enforce the order of dismissal, not any

11       Settlement Agreement or any fee provisions.

12                   THE COURT:  Are you challenging

13       the Court's jurisdiction to handle this motion?

14                   MR. BUCZKO:  I will say that the

15       basis for jurisdiction as argued in Medtronic's

16       motion is wrong, that there's ancillary

17       jurisdiction pursuant to the Kokkonen case

18       because there's a court order that incorporates

19       the Settlement Agreement or the terms of the

20       Settlement Agreement, which it does not as you

21       see here.

22                   The stipulations of dismissal

23       states only that there's an acknowledgement of

24       some contractual obligation to indemnify

1      Medtronic for costs, expenses and attorneys'

2      fees and that's really just an exception to the

3      general rule as articulated lower down in the

4      articulation that the parties will bear their

5      own costs.

6                    THE COURT:  So the end result of

7      that is you don't challenge the Court's

8      jurisdiction to rule on the Motion to Enforce?

9                    MR. BUCZKO:  I think it's

10     Medtronic's burden to establish this sort of

11     ancillary jurisdiction and our argument is

12     Medtronic has not met its burden, and this was

13     talked about in our opening brief.

14                   THE COURT:  What would need to be

15     shown to meet its burden?

16                   MR. BUCZKO:  It's not completely

17     clear in the case law.  Medtronic would have to

18     show in this order of dismissal, for example,

19     that if the Court ordered that, it would retain

20     jurisdiction to enforce the Settlement Agreement

21     and that's pretty clear in the case law, the

22     Supreme Court case law in the Kokkonen case.

23                   Actually, I have some slides

24     prepared here.  And this is the Kokkonen Supreme

1    Court case 1994.  This is a seminal case on

2    ancillary jurisdiction to enforce settlement

3    agreements.  This is cited in Medtronic's

4    opening brief.  And it requires that for a court

5    to have ancillary jurisdiction over enforcement

6    of a settlement agreement, the court would have

7    to retain jurisdiction over the settlement

8    contract, and I underlined contract.  That was

9    not underlined by the court, and that is not the

10   case here.  The Court did retain jurisdiction to

11   enforce the order of dismissal.

12            Another way that Medtronic could

13   have shown that this Court has jurisdiction to

14   decide this motion is that there could have been

15   a recognition or the Court could have adopted in

16   terms of the Settlement Agreement in the

17   stipulation of dismissal order.  And it really

18   didn't do that.  If we read here, it says,

19   Except as set forth specifically in the

20   settlement between the parties, wherein

21   Orthophoenix and IP Navigation Group

22   acknowledged a contractual obligation to

23   indemnify Medtronic for its costs, expenses and

24   attorneys' fees incurred in this matter, the

1          above-identified parties agree that they will

2          bear their own costs.  So the Court just

3          acknowledged and just ordered there was some

4          exception to the general rule that the parties

5          bear their own costs.

6                          THE COURT:  Where in your brief

7          did you argue this?

8                          MR. BUCZKO:  This is in our -- we

9          mentioned jurisdiction in our opening brief in

10         the first argument section.  The point that was

11         made was that if Medtronic's reading of this

12         stipulation of the contract was wrong, then this

13         Court would not have jurisdiction to decide this

14         motion.

15                         THE COURT:  You didn't cite

16         Kokkenon in your brief, did you?

17                         MR. BUCZKO:  We did not.

18                         THE COURT:  But I should have

19         understood that you were challenging the

20         Court's -- you're challenging whether or not

21         Medtronic met its burden to show that the Court

22         has jurisdiction?

23                         MR. BUCZKO:  That's correct, Your

24         Honor.

```
 1              THE COURT:  And tell me again
 2    where I should have understood that from?
 3              MR. BUCZKO:  So this is on Page 10
 4    of Orthophoenix's opposition where we state,
 5    Medtronic's motions including its argument
 6    regarding jurisdiction relies exclusively on,
 7    legally on tenable conclusion, therefore, this
 8    motion should be denied in its entirety.
 9              THE COURT:  Is that the only
10    reference to jurisdiction in your brief?
11              MR. BUCZKO:  Yes, Your Honor.
12              THE COURT:  And I take it if I
13    agree with their interpretation of 2.7, then you
14    have no argument about jurisdiction?
15              MR. BUCZKO:  That's not exactly
16    true, Your Honor, because the basis for
17    jurisdiction would be what's in the Court's
18    order, not in Section 2.7.  And what's written
19    in the contract is not the same as Section 2.7.
20              THE COURT:  Would you at least
21    knowledge that there's no way anyone can read
22    your brief to have some argument about lack of
23    jurisdiction outside of you disagreeing with
24    their interpretation of 2.7?
```

```
 1              MR. BUCZKO:  That would be

 2      difficult for me to do, Your Honor.  I take your

 3      point, Your Honor, but I think the idea behind

 4      this argument really came forth after reading

 5      Medtronic's reply brief where its primary point

 6      was that the Court ordered full indemnification.

 7      So looking at this Court's order and not seeing

 8      any basis for that argument, we read and saw

 9      what the consequences was of that representation

10      being false.  And number one, was that the basis

11      for jurisdiction went away.  We didn't have a

12      sur-reply in this case, Your Honor.  And this is

13      something that would have been flushed out more

14      completely in that sort of response.

15              So the Third Circuit has a case

16      that really holds substantially the same as the

17      Supreme Court case in that the dismissal order

18      needs to contain a provision retaining

19      jurisdiction over the Settlement Agreement or

20      incorporate Settlement Agreement terms and that

21      needs to be ordered by the Court to have

22      ancillary jurisdiction.

23              So given that there's no

24      court-approved allocation of fees, and that's a
```

```
1       quote from Medtronic's reply brief, where are

2       we.  We need to look at the contracts.  So here

3       is Section 2.7 of the Settlement License

4       Agreement.  And as Your Honor previously

5       questioned Medtronic, we will see here that this

6       provision had the language by contract the

7       Orthophoenix Parties and IP Navigation Parties,

8       past tense, have agreed to indemnify and

9       reimburse the Medtronic Parties.

10                   So reading this along with the

11      stipulation, it suggests that and it really

12      proves that this agreement right here points to

13      the past tense agreement for indemnification.

14      Interestingly, the stipulation is Exhibit C to

15      this agreement so it's actually intrinsic record

16      that this is an acknowledgement of a past

17      indemnification obligation and that would be in

18      the PPA.

19                   THE COURT:  Well, what about how

20      it describes that obligation?  It says that you

21      will reimburse them for all fees and expenses,

22      and then it goes on to say the Medtronic Parties

23      will not pay their own fees, costs and expenses.

24                   MR. BUCZKO:  That was something
```

1       that was introduced by Medtronic, that language.

2       And it's an inaccurate representation of what

3       the PPA says.  I disagree with counsel for

4       Medtronic when Medtronic states that in

5       agreement to pay everything is a compromise.

6       It's not.  This isn't a --

7                    THE COURT:  They could have

8       required you to litigate, pay litigation fees

9       and maybe they have an argument that they can

10      get more than that.

11                   MR. BUCZKO:  Such an argument is

12      not -- we haven't seen that's been made in the

13      papers.  I think Medtronic saying, well, if you

14      don't agree to pay everything, we will have to

15      bring you to court, that's not consideration.

16      There are cases that say that's not

17      consideration, and they haven't made that

18      argument either.

19                   THE COURT:  Well, is there any

20      evidence that there was a mistake, that what

21      they put in there was inaccurate and/or that you

22      all misunderstood it?

23                   MR. BUCZKO:  I think the evidence

24      are the facts of the case.  So just going

```
 1      through the timeline, in early 2015 Mr. Reines

 2      contacted litigation counsel of Orthophoenix and

 3      asked for indemnification.  Litigation counsel

 4      refused and then after that time period, counsel

 5      for Medtronic actually stopped communicating

 6      with litigation counsel who were refusing

 7      indemnification and communicated directly with

 8      the principals.

 9                      THE COURT:  You mentioned that in

10      the brief.  What is the relevance of that?

11                      MR. BUCZKO:  It shows that having

12      been informed that indemnification was refused

13      and there's a dispute that representations were

14      made directly to the principals by passing the

15      attorney who refused indemnification.

16                      THE COURT:  It might show that,

17      but again, what is the relevance of that?

18                      MR. BUCZKO:  The relevance is that

19      under the law of mutual mistake that there was

20      representations made that Medtronic knew that or

21      tried to create a misapprehension of fact that

22      it was entitled to full indemnity by

23      communicating directly with the Orthophoenix

24      principals.
```

```
 1              THE COURT:  Other than that
 2   January 2015 where your co-counsel denied the
 3   indemnification obligation, other than that
 4   after that, is there any evidence in my record
 5   that anybody on Orthophoenix's side mistakenly
 6   thought that the indemnification obligation was
 7   anything other than what Medtronic is telling me
 8   what it is?
 9              MR. BUCZKO:  Well, it's our
10   position that they correctly thought that what
11   Medtronic -- not what Medtronic says it is here,
12   but there are the statements really on May 24th
13   of 2016 that was the letter also from litigation
14   counsel.
15              THE COURT:  What about the emails
16   earlier than May 24th?  May 23rd or May 21st and
17   May 11th?
18              MR. BUCZKO:  There were still
19   questions about the invoices on May 24th, and I
20   can show you the emails actually --
21              THE COURT:  Show me other than
22   that letter at the end which evidently came as a
23   complete shock to Mr. Reines where you raised
24   any questions.
```

```
1            MR. BUCZKO:  So here is where on

2    May 11th Mr. Croxall represented, I have

3    questions on the bills.  I can talk to you.  It

4    says absolutely.  So the point here is that

5    Orthophoenix never really agreed to pay all of

6    the invoices.  It still had in its mind that

7    there was a more limited indemnity obligation.

8            THE COURT:  I'm just failing to

9    see where you get that.  If I have questions,

10   can I talk to you, absolutely.  How does one

11   reasonably read that as I do have questions,

12   here they are and I disagree that we owe you the

13   $560,000?

14           MR. BUCZKO:  I think the next

15   communication of that came up on May 24th.

16           THE COURT:  Well, this is the

17   letter from the first communication of that,

18   isn't it?

19           MR. BUCZKO:  Well, there was a

20   prior communication in February of 2015, Your

21   Honor, but between those time periods, we don't

22   have statements in the record --

23           THE COURT:  I take it you can

24   agree that I can look at all of this that both
```

1          sides have attached in resolving this motion; is

2          that right?

3                        MR. BUCZKO:  Not exactly, because

4          counsel for Medtronic brought up some statements

5          about some dealings in winter of 2016 that I

6          don't see any evidence in the record of that.

7                        THE COURT:  That was his slides in

8          his representations today.  That's what you're

9          referring to?

10                        MR. BUCZKO:  Yes, Your Honor.

11                        THE COURT:  But the emails and the

12         declarations and what you all submitted in

13         writing before the hearing, does Orthophoenix

14         have any objection to me considering those for

15         purposes of resolving this motion?

16                        MR. BUCZKO:  No, Your Honor.  For

17         the mutual mistake argument, this is what we

18         submitted and we're not submitting anything

19         else.

20                        THE COURT:  Well, in the

21         Settlement Agreement as you noted it does have

22         the phrase by contract.  Why would the parties

23         use that phrase if all they meant was the Patent

24         Purchase Agreement and/or the License Agreement

1          as opposed to the Settlement Agreement?

2                    MR. BUCZKO:  It refers to the

3          prior contractual obligations.  It confirms that

4          the SLA is not creating a new obligation of

5          indemnification.  That's really what I'm trying

6          to find, the language here.

7                    THE COURT:  It's 2.7.

8                    MR. BUCZKO:  So it shows in the

9          past tense.  Now, understandably, Your Honor, it

10         doesn't say that the PPA -- there are other

11         contracts that the PPA controls for

12         indemnification.  It just states in the past

13         tense that there's been a contractual agreement

14         about indemnification, which we don't dispute.

15         The dispute is which contract that refers to.

16                    THE COURT:  The Settlement

17         Agreement elsewhere does refer expressly to the

18         Patent Purchase Agreement, does it not?

19                    MR. BUCZKO:  It does refer to the

20         Patent Purchase Agreement.

21                    THE COURT:  If the parties

22         intended to say all we've done here is reiterate

23         what we've already agreed to in the past in the

24         Patent Purchase Agreement, why do they use a

1      broader phase by contract?

2                    MR. BUCZKO:  I think the

3      Settlement Agreement was really a contract

4      between a lot of parties and different parties

5      added language at different times.  And that may

6      go into explaining why different language has

7      been used in different parts.  This particular

8      provision was added by Medtronic and that's

9      exhibited in our papers.

10                   THE COURT:  Why shouldn't I hold

11     Orthophoenix to this contractual language rather

12     than say, well, I guess they couldn't have meant

13     that?

14                   MR. BUCZKO:  Well, I think the

15     point is that if Your Honor holds that it

16     does refer -- this is a contractual obligation

17     itself, we made the argument that it's not valid

18     for lack of consideration.

19                   THE COURT:  Well, let's talk about

20     lack of consideration.  You do recall that the

21     Motion to Dismiss for lack of standing was

22     pending at the time that you settled this case,

23     correct?

24                   MR. BUCZKO:  Yes, Your Honor.

```
 1              THE COURT:  You never argued that
 2     that motion was frivolous, did you?
 3              MR. BUCZKO:  Well, we disputed the
 4     motion, Your Honor.  We did not do any Rule 11
 5     papers on the motion.
 6              THE COURT:  If I thought that
 7     there was potentially some merit to that motion,
 8     would the Settlement Agreement thereby have some
 9     consideration for you all?
10              MR. BUCZKO:  I don't think so,
11     Your Honor.  The reason is Medtronic hasn't had
12     an actual claim that it relinquishes to be
13     consideration, and Medtronic represented in the
14     preamble of the SLA that it has no claims, ███
██     ████████████████████████████████████████████
██     ██████████████████████████████████████████
██     ███████████████████████████████████████████████
██     ████████████████████████████████████████████
██     ███████████████████████████████████████
██     ████████████████████████████████████████████
██     ██████████████████████████████  So Medtronic
22     relinquished nothing by its own admission.
23              Furthermore, as far as perfecting
24     title in the patent, Medtronic had that
```

1    obligation in the PPA.  They had the obligation

2    to execute instruments fully affecting the

3    transfer.  So it was Stryker's argument that

4    Medtronic didn't do that in the PPA, but they

5    had the obligation to do that.  They had the

6    obligation to execute the second amendment to

7    the PPA.  It withheld --

8                    THE COURT:  Those are two

9    different things.  They say they didn't have an

10   obligation to perfect it in precisely the way

11   and time and manner that you wanted it done.

12   Are they wrong about that?

13                   MR. BUCZKO:  As far as qualifying

14   for consideration, I think the umbrella is

15   larger if you're saying that under that umbrella

16   is that they had to perfect title in the patent

17   in executing instruments.  That involved signing

18   your name, that involved filling out forms.  I

19   think that's a reasonable interpretation of

20   their pre-existing duty, is that it does involve

21   having to fill out forms and perfect titles and

22   sign things and not hold up deals by refusing to

23   signs thing that you have the obligation to do.

24                   THE COURT:  Well, the reason I ask

```
 1        is there's a lot of case law that says I really
 2        shouldn't look very closely at whether there was
 3        consideration or whether there was enough
 4        consideration or whether you got a good deal or
 5        bad deal or could have gotten a better deal and
 6        it's really pretty hard to not find some
 7        sufficient consideration.  You're arguing up
 8        against all of that, aren't you?
 9                     MR. BUCZKO:  I disagree, Your
10        Honor.  Something needs to qualify first as
11        consideration.  Once it qualifies as
12        consideration, then, sure, the poetic
13        explanation is that it could be a peppercorn,
14        but the pre-existing duty rule says that things
15        you have a legal obligation to do, do not
16        qualify as consideration.  You don't even weigh
17        it.  It doesn't even go on the scale.
18                     THE COURT:  So what about the
19        evidence that ███████████████████████████
          ██  ████████
21                     MR. BUCZKO:  I haven't seen that
22        evidence.  That was presented as attorney
23        argument in this hearing.
24                     THE COURT:  Is that not a
```

1     reasonable inference from emails from your side

2     that said, obviously, you need to sign the

3     second amendment before we can finish the

4     Settlement Agreement, something to that effect?

5               MR. BUCZKO:  Yes.  Stryker I

6     imagine did want a fully perfected transfer.  I

7     think Stryker -- I can't speak for Stryker and

8     there's no evidence in the record what Stryker

9     was thinking, but I think Stryker wanted to make

10    sure that Medtronic wouldn't sue on these

11    Orthophoenix patents.

12              THE COURT:  Well, Stryker is on

13    the record, I think, at that time saying they

14    think Medtronic owned the patents, aren't they?

15              MR. BUCZKO:  Yes, that was their

16    motion, that there was some ownership interest.

17              THE COURT:  Why isn't the only

18    reasonable inference from the record I now have

19    that without Medtronic at the table there was

20    going to be a ruling on the motion which may or

21    may not have been favorable to your side, but in

22    any event, the risk of all of that going away

23    and that was the only way this case was going to

24    get settled, some of that has to constitute

1    consideration?

2              MR. BUCZKO:  What Medtronic did

3    was fully perfect the transfer and made

4    representative warranties about what interests

5    it retained in the Orthophoenix patents and it

6    had to make those representations pursuant to

7    the PPA.  So what it did was a pre-existing

8    duty.  And to the extent it refused to do that,

9    it was holding up the deal.  And that's the idea

10   behind the pre-existing duty, that someone

11   doesn't drag their feet and heels and say, look,

12   I know I have to do this but I'm not going to do

13   it until you give me something else.

14             THE COURT:  It is true there's no

15   declaration in the record that indicates that

16   anyone on your side actually had a different

17   view of what 2.7 of the indemnification

18   obligation is; isn't that correct?

19             MR. BUCZKO:  There's no

20   declaration from our side on the meaning of 2.7

21   indemnification.  There's also no declarations

22   from the other side of 2.7.

23             THE COURT:  But you're the one

24   arguing that I should find on this record a

1      mistake, correct?

2                      MR. BUCZKO:  Yes, Your Honor.  As

3      I discussed we're depending on the papers for

4      that, that are submitted on the statements by

5      litigation counsel from Orthophoenix in early

6      2015 and May 2016.

7                      THE COURT:  Do you think that I

8      can find a genuine dispute of fact on this

9      record?

10                     MR. BUCZKO:  Yes, I believe you

11     can, Your Honor.

12                     THE COURT:  And if I do, then

13     what?

14                     MR. BUCZKO:  Then I think the

15     motion needs to be denied.  We've offered to

16     talk about this with Medtronic.  They refused.

17     They filed this motion, and just --

18                     THE COURT:  But deny the motion

19     and what, then you pay nothing?

20                     MR. BUCZKO:  Well, then if this

21     motion is denied, Medtronic would have rights.

22     I would imagine Medtronic could sue the state

23     courts if they wanted to.  They could maybe sue

24     in Federal Circuit.  They can work up the

1      jurisdiction for that.

2                      THE COURT:  But I shouldn't treat

3      this as akin to a summary judgment motion and if

4      I deny it on the basis of a disputed fact,

5      saying give me your schedules for discovery and

6      how we're going to resolve that dispute of fact?

7                      MR. BUCZKO:  If that's something

8      Your Honor chooses to do, if Your Honor sees a

9      dispute of fact, I think that's something that

10     is fair.  I do think there are issues of fact

11     here and I do think that there are

12     representations being made even in this oral

13     argument hearing that aren't shown in the record

14     at this time.

15                     THE COURT:  So give me some

16     examples of the issues of fact that you think

17     that should cause me to deny the motion?

18                     MR. BUCZKO:  On mutual mistake I

19     think is the primary one, Your Honor.  On

20     consideration, it's really our position actually

21     that there's no consideration as a matter of

22     law, so I think the actions and the contractual

23     provisions speak for themselves.  So I don't

24     think there's a disputed fact there.

```
1          Your Honor, if Your Honor holds

2    that Section 2.7 of the SLA is ambiguous or any

3    other provision is ambiguous, then that brings

4    in parol evidence and those would be disputed

5    issues of fact.

6          THE COURT:  There was a

7    representation made that Medtronic did request

8    indemnification perhaps at the outset of the

9    case and what they were offered was

10   representation by your firm which was conflicted

11   and, therefore, they denied or declined that.

12   Do you dispute that that's what occurred?

13          MR. BUCZKO:  I do, Your Honor.

14   The only record I've seen in the papers and that

15   I know of, Your Honor, is Mr. Reines contacted

16   litigation counsel for Orthophoenix about

17   indemnification.  Orthophoenix first -- and this

18   was a phone call and this is reflected in

19   Mr. Fenster's Declaration and it's also

20   reflected in one of the exhibits to our

21   opposition.

22          Mr. Fenster expressed questions

23   about the indemnification obligation and noted

24   that going forward because at that time the
```

1     antitrust claim was stayed, there would be a lot

2     of discovery work and Mr. Fenster asked that

3     Russ, August & Kabat, our firm, handle the

4     discovery load.  There's no response in the

5     record.  I'm not aware of any response from

6     Medtronic.  The next communication from

7     Medtronic I'm aware of is communications

8     demanding indemnification later in the year.

9                    THE COURT:  Do you dispute there's

10    a conflict between your firm and Medtronic?

11                   MR. BUCZKO:  I don't know whether

12    or not there was a conflict.  I actually don't

13    think it's relevant.  We could have gotten

14    another firm.  We could have exercised some

15    oversight of the bills and this gets into the

16    reasonableness of expenses, but it maybe didn't

17    have to be that Russ, August & Kabat, but

18    Medtronic ignored Orthophoenix's request and

19    then elected to use its own counsel and then

20    sought indemnification under the PPA.

21                   THE COURT:  Where in Section 2.7

22    do you see a limitation for reasonable

23    attorneys' fees?

24                   MR. BUCZKO:  The basis for the

```
 1        limit of attorneys' fees is really Delaware law.

 2        All indemnification contracts are limited to

 3        reasonable attorneys' fees.  And that is the

 4        policy of Delaware and the case law is cited in

 5        our opposition brief.  And it makes perfect

 6        sense in that an indemnified party would really

 7        go spend large sums of money, maybe unnecessary

 8        sums of money, there's no oversight there, and

 9        would not be careful about controlling costs.

10        So there's really a public policy in Delaware

11        law that indemnity contracts be limited to

12        reasonable expenses.

13                    THE COURT:  Are you alleging that

14        the fees here were driven up in bad faith?

15                    MR. BUCZKO:  I'm not alleging bad

16        faith.  I know nothing about bad faith as far as

17        the attorneys working on the Medtronic discovery

18        matters.  I do know that Medtronic admits that

19        the vast bulk of the fees were for discovery,

20        the patent litigation matter after the antitrust

21        claim was stayed and the attorneys who worked on

22        reviewing documents as such billed amounts of

23        $650 to $1100 an hour, and I have a slide on

24        this.
```

```
 1                    There are entries from timekeepers

 2         who weren't even identified billing at $1,000 an

 3         hour.  There were unnecessary attendance and

 4         expenses going to Markman hearing and

 5         third-party depositions and hearings that really

 6         involved the underlying patent case.  So I don't

 7         believe that they're reasonable.  I don't know

 8         if they were done in bad faith.  Bad faith is

 9         not required.  Some expenses can be unreasonable

10         but not incurred in bad faith.

11                    THE COURT:  All right.  Talk about

12         interest.  Did you raise any objection to pre-

13         post-judgment interest in your brief?

14                    MR. BUCZKO:  Not in the brief, but

15         in response to Your Honor's letter, the request

16         for a letter that we submitted on Friday.  It's

17         our position that, and it's reflected in our

18         letter very briefly, while the damages aren't

19         liquidated, they don't need to be liquidated for

20         prejudgment interest to be attached.  Here we

21         need to look at the reasonableness of the

22         expense and get to a number.  Once we reach that

23         number and there's a judgment or order, then we

24         can talk about interest.
```

```
1              THE COURT:  I think it's argued

2      that you didn't raise any objection to interest

3      which was clearly sought in their opening brief.

4      You didn't raise any objection to that in your

5      answering brief.  If that is, in fact, the case,

6      why shouldn't I view any objection to interest

7      as waived?

8              MR. BUCZKO:  Well, we disputed the

9      underlying amounts and there was a request for

10     interest in the brief and we disputed the

11     underlying amount and we responded to Your

12     Honor's letter request.  I don't think it's an

13     issue that would be waived.  I think it's an

14     issue that can be argued at a later period of

15     time.  It doesn't go directly to the merits.  It

16     goes to a remedy at judgment of basically an

17     attempt to make Medtronic whole.

18              THE COURT:  I guess I'm still left

19     with trying to understand your interpretation of

20     all of those emails and the back and forth and

21     the time that the Settlement Agreement was being

22     negotiated and then filed.  The speculation is

23     that all the lawyers basically agreed to this

24     and you never had any doubts about it, and then
```

```
 1        somebody intervened at the very last minute and

 2        said let's change course and probably fight

 3        about it.

 4                    Is there anything in the record

 5        that would be inconsistent with that

 6        speculation?

 7                    MR. BUCZKO:  I don't think it was

 8        a change of course.  I think that different

 9        members of the team were involved with -- and I

10        know that different members of the team were

11        involved with the Settlement License Agreement

12        and the negotiation of those provisions.  And

13        the members of the team that disputed

14        indemnification and denied indemnification,

15        especially litigation counsel for Orthophoenix

16        became involved later and reminded the parties

17        that there was not indemnification to enter the

18        PPA.

19                    The PPA is a complicated contract.

20        That indemnification provision is kind of --

21        it's amazing it always ends up in the same place

22        which is there's no indemnity due, but there are

23        a lot of words and a lot of subparts in that

24        provision, so it's understandable that the
```

1    Orthophoenix Parties became mistaken or

2    misunderstood the provision.

3              THE COURT:  Is it your view that

4    on this record I should view the Orthophoenix

5    side of the transaction as mistaken until, I

6    think, even the morning of when that May 24th

7    letter came and just at the very last minute in

8    writing that letter now understood what their

9    rights really were all along?

10             MR. BUCZKO:  I think as of the

11   signing of the SLA with the injection of the all

12   language, I think they were mistaken.  There

13   were requests for few details of invoices on May

14   11th as we saw, and there were further

15   communications about details from invoices.  The

16   Orthophoenix Parties could have learned during

17   that time period or know during that time period

18   that the indemnification sought by Medtronic was

19   not allowable under the contract at that period

20   of time.  We don't have emails in the record to

21   dispute that precise period of time, for

22   instance, May 5th and May 24th.

23             THE COURT:  It's undisputed that

24   the $563,000 or thereabout number was known to

1      Orthophoenix before they signed the Settlement

2      Agreement, isn't it, or before it became

3      effective?

4                    MR. BUCZKO:  Yes, Your Honor.  I

5      know at least the $440,000 figure, and that was

6      in an email to the Orthophoenix Parties.

7                    THE COURT:  As well as reference

8      to, hey, we've had a lot of discovery costs in

9      the last few weeks, i.e., during the time when

10     the antitrust discovery has been stayed.  That

11     was all clearly communicated to Orthophoenix

12     before they signed the Settlement Agreement,

13     wasn't it?

14                   MR. BUCZKO:  It was communicated

15     to some members of the Orthophoenix team.  Like

16     I explained, the members of the team who denied

17     indemnification and really started the dispute

18     about indemnification were left out of those

19     communications.

20                   THE COURT:  Well, there was

21     nothing to prevent the Orthophoenix team to

22     share those communications amongst themselves,

23     were there?

24                   MR. BUCZKO:  No, Your Honor.

```
 1              THE COURT:  And nonetheless

 2     represented by sophisticated counsel, the

 3     Orthophoenix team signed off on the Settlement

 4     Agreement, didn't it?

 5              MR. BUCZKO:  Well, I think this

 6     goes to the pre-existing duty rule because

 7     Medtronic was holding up the deal by refusing to

 8     move and refusing to execute the instruments it

 9     had the obligation to do.  So in order to do

10     this and in order to effect that Medtronic

11     performs its duty, Orthophoenix agreed to or

12     signed off on the agreement with that language.

13     But the whole point of the pre-existing duty

14     rule is that that's not an enforceable bargain.

15              THE COURT:  Anything else?

16              MR. BUCZKO:  Just some other

17     points, Your Honor, I can go through quickly.

18     Here we see that Orthophoenix never agreed to

19     pay all of the invoices.  They always had

20     questions.  There were communications here and

21     there about whether -- yeah, we agree on

22     payment, we agree on payment, but it still had

23     questions about the invoices.  So it's not a

24     liquidated amount that --
```

1          THE COURT:  You're saying

2    throughout but you've shown me one place where

3    Mr. Croxall says, can I ask you questions, and

4    the immediate answer is yes.  You haven't shown

5    me anywhere else where they've expressed any

6    doubt that they owe an obligation to pay what

7    looked like all of those fees and expenses.

8          MR. BUCZKO:  There was one on May

9    11th and May 24th.

10         THE COURT:  But May 24th is well

11   after you signed the agreement and it's hours

12   after you're still suggesting you're going to

13   pay everything, isn't it?

14         MR. BUCZKO:  It is, Your Honor.

15   But there's actually a duty in the PPA for there

16   to be a time period to discuss disputes with

17   regard to indemnification.  And here in 7.8 of

18   the PPA, it says, ███████████████████████

███   ████████████████████████████████████

███   ████████████████████████████████████

███   ████████████████████████████████████

███   ███████████████████████████████████

███   ███████████████████████████████████

███   ████████████████████████████████████████

1      ████████      That didn't happen here.  There was

2      the letter on May 24th, and then Medtronic filed

3      its motion in early June.  So just this motion

4      violates the PPA.

5                    THE COURT:  Do you cite 7.8 in

6      your brief?

7                    MR. BUCZKO:  No, Your Honor.  Just

8      one other point.  Counsel for Medtronic brought

9      up Section 3.5 of the License Agreement and this

10     is a document that accompanies the PPA, whereby

11     the ████████████████████████████████████████████

       ████████████████████████████████████████████████

       ████████████████████████████████████████████████

       ████████████████████████████████  This relates to

15     situations in which Medtronic is added as a

16     necessary third party to effect standing and it

17     would have to -- Medtronic would suffer claim,

18     damage, liability or attorneys' fees.

19                    THE COURT:  Where does it say

20     that?

21                    MR. BUCZKO:  I can pull out the

22     entire provision and put on the document camera.

23     Here, Your Honor, is Section 3.5 on the slide.

24     Section 3.4 talks about ██████████████████████

1   ████████████████████████████████████████

2   ███████████████████████████████████████

3   ██████████████   And then following on, this is where

4   Orthophoenix agrees ████████████████████████

5   ████████████████████████████████████████████

6   ███████████████████████████████████████

7   ████████████████████████████████████████████

8   ████████████   Don't read this as referring -- as

9   indemnity for attorneys' fees related to

10  discovery that Medtronic would embark on either

11  as an antitrust defendant or basically a third

12  party in a patent case.

13              THE COURT:  First off, you see 3.5

14  as limited by 3.4?

15              MR. BUCZKO:  I believe it's read

16  with 3.4, Your Honor.  It doesn't refer

17  explicitly to 3.4.

18              THE COURT:  Even assuming it does,

19  wasn't it alleged here by a third party that

20  Medtronic is a necessary or indispensable party

21  to the lawsuit brought by Orthophoenix?

22              MR. BUCZKO:  Stryker did allege

23  that Medtronic had interest in the patents, but

24  Medtronic was never added as a Plaintiff in

1    the --

2                    THE COURT:  Because you all

3    resolved the case before I ruled on the motion.

4    But 3.4, talking in terms of allegations, wasn't

5    that specifically part of what was alleged by

6    Stryker, that Medtronic is a necessary or

7    indispensable party to any lawsuit or claim

8    brought by the licensor, i.e., this lawsuit?

9                    MR. BUCZKO:  I think Stryker

10   argued that Medtronic's sole interest in the

11   patent -- I don't think Stryker sought to add

12   Medtronic as a party to the patent case.

13                   THE COURT:  Wasn't that one

14   possible resolution of that motion?

15                   MR. BUCZKO:  It could have been

16   something that was embarked on after resolution

17   of the motion.  I don't think it was

18   specifically asked for in the motion adding

19   Medtronic.

20                   THE COURT:  All right.  Anything

21   else you want to add?

22                   MR. BUCZKO:  And just briefly, one

23   more point.  So in early 2015 Medtronic and

24   Orthophoenix agreed that disputes regarding

1       payments to be made for indemnification of

2       Medtronic by Maker, which is Orthophoenix, or

3       shall be governed by and construed as set forth

4       in the PPA.  So to the extent there's any

5       question as to what agreement controls the

6       inquiry of indemnification, there was early

7       agreement by Medtronic in 2015 that the PPA

8       would control.

9                    THE COURT:  And the parties were

10      not free to modify that in the Settlement

11      Agreement or some other contract?

12                   MR. BUCZKO:  I think the parties

13      could have modified it.  There would have been

14      consideration.  Also, under the principles of

15      Novation, there's no reference to an earlier

16      agreement being superseded in the SLA.  This is

17      an important point that I haven't made but,

18      sure, the parties could have entered into a new

19      indemnification contract but it would need to be

20      supported by and bargained for detriment for

21      Medtronic or a benefit for Orthophoenix.  And

22      that's all I have.  Thank you.

23                   THE COURT:  Thank you very much.

24      Mr. Reines, any rebuttal?

```
 1                    MR. REINES:  Yes, Your Honor, just
 2        a few points.  First of all, there was no
 3        hold-up in this case.  Medtronic was honorable
 4        from the beginning to end.  There's no document.
 5        There's no testimony.  There's no substantive
 6        argument that somehow we said we're not going to
 7        agree to anything.  It was an effortless
 8        negotiation.  There was no resistance.  That's
 9        what happened.
10                    In terms of whether they had
11        counsel, not only is this incredibly
12        sophisticated people, they have staffs that made
13        outside counsel come in necessary for the
14        settlement negotiations, but they attached the
15        agreement, the stipulation, that the Court
16        signed.  It is hard to believe that they
17        wouldn't have outside counsel review those as
18        part of the Settlement Agreement which recited
19        the indemnity obligation and pointed to the
20        Settlement Agreement, and then counsel even
21        submitted that before the repudiation happened.
22        It was submitted to the Court before the
23        repudiation, so the see no evil argument just
24        doesn't work with that.
```

1           With respect to consideration, the

2      record is replete complete with consideration

3      that we didn't detail every single point.  One

4      point is the provision in the License Agreement

5      for indemnity, that 3.5 says ████████████

       ██████so I don't know what -- in the English

7      understanding, you need to understand that we

8      were covered on indemnity without qualification.

9      Because of the approach that we took with this

10     motion which we think was ripe which was the

11     agreement that we're moving on is from this

12     year, we have not sought interest, backed all

13     the invoices that were given to them over the

14     life of the contract and their denial of

15     indemnity, and they were denying indemnity

16     throughout this case.  If we didn't seek

17     interest back on that because we've entered into

18     a new agreement in the Settlement Agreement that

19     validated they were going to pass everything as

20     of that date so --

21             THE COURT:  The lack of seeking

22     that earlier interest could be consideration as

23     well.

24             MR. REINES:  In fact, it's

1    consideration.  I don't think it's particularly

2    debatable.  And then the argument that we had no

3    claim, with all respect these arguments are

4    below the line that we should be hearing here.

5    In the preamble we stated we had no claim in the

6    case.  It's obvious on the docket we're talking

7    about no claim in the case.  Obviously, we had

8    an indemnity claim that's compromised as part of

9    the Settlement Agreement ultimately wrapped in

10   and the agreement is what's documented in the

11   agreement.  So to say we had no claim going in

12   for indemnity is just absolutely meritless.  So

13   the consideration's argument just don't work.

14                On mutual mistake, and I don't

15   know if unilateral mistake is being waived, I

16   didn't hear any reference to it, no one was

17   mistaken on our side and I don't think there's

18   an allegation of that, which you would need for

19   mutual mistake.  But what's really important I

20   think for the Court in taking this and

21   finalizing this matter is the position taken was

22   we've submitted what we've got on this.  We're

23   not going to submit anything else.  And that's

24   what the transcript will show.

 1          So this idea that there's an

 2     evidentiary hearing on mutual mistake, they have

 3     given you what they've got and it falls well

 4     below any standard for reformation and mistake.

 5     And in terms of the extrinsic evidence under the

 6     consideration argument, just doubling back to

 7     that in terms of what facts might be in dispute,

 8     the parol evidence is all that I heard invoked

 9     there.

10          Again, there's no real debate of

11     how that provision could be interpreted.  We saw

12     in the plain language basis it says all and that

13     we don't pay any.  But even if there were, the

14     only thing they cite as extrinsic evidence oddly

15     enough is the stipulation which as accepted is

16     provided in the agreement to indemnify.  It's

17     not extrinsic evidence.  I took everyone's time

18     today with the litany of extrinsic evidence that

19     showed what the deal was.

20          I guess I have a final thought in

21     the subject of -- well, let me address the

22     reasonableness of the fees and all that.

23     There's no case where someone agrees to pay all

24     as part of the end of the litigation-terminating

```
 1        event where it's largely liquidated and agreed

 2        to all and some court doubles back and says

 3        we're going to second-guess that agreement to

 4        all based on the situation.

 5                     And the fact that this motion is

 6        proceeding, I mean, there's no punitive damages

 7        being sought or anything like that, but there

 8        does need to be discouraging people from

 9        repudiating an agreement on the theory that

10        people have better things to do and will take a

11        discount on a number just to get rid of the

12        matter.  And if there's anything that could be

13        accomplished in this order on that front, I

14        think it would be service to the entire system

15        and profession.  But the fees, the interest on

16        it at least one small way, we're foregoing the

17        interest back, but at least from when they

18        agreed to it forward, we would ask for interest.

19        I don't know if the Court has any questions --

20                     THE COURT:  No.

21                     MR. REINES:  Thank you, Your

22        Honor.

23                     THE COURT:  Thank you.

24                     MR. BUCZKO:  Your Honor, can I
```

1    address a few points quickly?

2              THE COURT:  Go ahead.

3              MR. BUCZKO:  As far as the

4    argument there's no claim in this case, Section

5    2.3 of the SLA is ████████████████████

     ████████████████████████████████████████

     ████████████████████████████████████████

     ███████████████████ --

9              THE COURT:  Are you disputing that

10   prior to the Settlement Agreement Medtronic had

11   an indemnification claim against the

12   Orthophoenix Parties?

13             MR. BUCZKO:  They did claim

14   indemnification.  I'm not disputing that.

15             THE COURT:  So to the extent you

16   are arguing, well, none of that is recited in

17   the Settlement Agreement, I shouldn't understand

18   that to be a dispute, that you recognize they

19   had a claim for indemnification and now they

20   don't because they settled it with you in the

21   Settlement Agreement?

22             MR. BUCZKO:  Well, I think the

23   point is that getting all fees is not a

24   compromise.  It was --

1          THE COURT:  Well, putting that

2     aside, you are not disputing that they had a

3     claim and now they say they don't have a claim

4     because they settled it with you?

5               MR. BUCZKO:  I'm not disputing

6     that, Your Honor.  As far as the release ████

  ██   ██████████████████████████████████ and I

8     think that's confirmed by the Settlement

9     Agreement itself.  We are arguing unilateral

10    mistake, not just mutual mistake.  That wasn't

11    waived.  I don't know where counsel from

12    Medtronic got that idea.  There were

13    misrepresentations of fact and Medtronic remain

14    silent.

15               As far as Section 3.5, the

16    indemnification application of PPA, the January

17    2015 agreement between Medtronic and

18    Orthophoenix agreement which confirms that the

19    indemnification is governed by the PPA, not the

20    License Agreement, so Your Honor, there should

21    be consideration to the Section 3.5 provision.

22    That's all I have.

23               THE COURT:  Mr. Reines, anything

24    else?

1                          MR. REINES:  Nothing further.

2                          THE COURT:  All right.  We will be

3        in recess.

4                          (The proceedings ended at

5        10:45 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1        C E R T I F I C A T I O N

2

3              I, Taneha Carroll, Professional

Court Reporter, certify that the foregoing is a

4   true and accurate transcript of the foregoing

5   proceeding.

6

7              I further certify that I am neither

8   attorney nor counsel for, nor related to nor

9   employed by any of the parties to the action in

10  which this proceeding was taken; further, that I am

11  not a relative or employee of any attorney or

12  counsel employed in this case, nor am I financially

13  interested in this action.

14

15

16       /s/ Taneha Carroll
         Taneha Carroll
17
         Professional Reporter and Notary Public
18

19

20

21

22

23

24































